**OFFICE OF THE PEOPLE'S COUNSEL OF THE DISTRICT OF COLUMBIA,**
Petitioner,

v.

**PUBLIC SERVICE COMMISSION OF THE DISTRICT OF COLUMBIA,**
Respondent,

**The Chesapeake and Potomac Telephone Company,**
Intervenor.

No. 89–361.

District of Columbia Court of Appeals.

Argued Nov. 1, 1989.
Decided March 14, 1990.

Matthew S. Watson, with whom Frederick D. Dorsey, Washington, D.C., Elizabeth A. Noel, L. Marie Guillory, Washington, D.C., and Sandra Mattavous–Frye were on the brief, for petitioner.

Howard C. Davenport, with whom Mary J. Sisak, Kenneth G. Vaughn, Phoenix, Ariz., and James L. Winston, Washington, D.C., were on the brief, for respondent.

Lee A. Satterfield, with whom Thomas L. Welch, Washington, D.C., Eric N. Miller, and Mark J. Mathis were on the brief, for intervenor.

Before NEWMAN, FERREN, and TERRY, Associate Judges.

FERREN, *Associate Judge:*

Petitioner, Office of the People's Counsel ("OPC"), challenges a decision of the Public Service Commission interpreting D.C. Code § 43–612(a) (1986). This section provides that regulated utilities shall bear the cost of various OPC and Commission expenses. It also sets limitations on reimbursable expenses that depend on whether the proceeding is a "valuation or rate case" or comes within "all other investigations." The Commission determined that, because the proceeding at issue did not include a formal hearing, it should be treated as "all other investigations," not as a "rate case" as OPC requested. The Commission ac-

cordingly assessed a special franchise tax upon The Chesapeake and Potomac Telephone Company ("C & P") under OPC's "other investigations" authority. OPC appeals, arguing that any proceeding in which a rate is set—as assertedly happened in this case—falls within the statutory definition of a "rate case." OPC further contends that, even if the Commission were correct in determining this is not a "rate case," the Commission exceeded its authority in ordering an "all other investigations" assessment without a request from OPC. We reject these arguments and affirm the Commission's decision.

## I.

On December 24, 1986, C & P filed with the Commission a tariff rate for Centrex service for a single customer, the International Bank for Reconstruction and Development ("the World Bank"). The tariff rate was the result of a contract C & P negotiated with the World Bank. No other rates or customers were affected by the tariff. The Commission initiated a Telephone Tariff proceeding, which allows for only a brief notice and comment period. See 34 D.C.Reg. 558 (1987) (notice of 30–day comment period for this filing).[1] On June 3, 1988, the Commission approved the World Bank tariff. Order No. 9028. OPC did not appeal that approval.

On June 27, 1988, OPC submitted a "Notice of Agency Fund Requirements" to the Commission, a formal request to cover OPC's expenses associated with carrying out its statutory mandate to represent taxpayers in the proceeding.[2] OPC maintained the World Bank tariff proceeding was a "rate case" within the meaning of D.C.Code § 43–612 and accordingly requested the Commission to order C & P to pay a special franchise tax of $34,000. On August 22, 1988, the Commission, relying on our decision in Washington Gas Light Co. v. Public Serv. Comm'n, 455 A.2d 384 (D.C.1982), issued Order No. 9092 in which it ruled that, although the Commission had set a rate when it approved the World Bank tariff, the proceeding was not a "case" for purposes of § 43–612 because it did not include a formal hearing. The Commission concluded, however, that the amount OPC had requested was consistent with OPC's statutory authority and supported by substantial evidence in the record. The Commission therefore assessed a franchise tax on C & P for the $34,000 requested but did so under OPC's "other investigations" authority.[3]

On appeal, OPC argues that the Commission misreads Washington Gas and § 43–612. It contends Washington Gas stands for the proposition that any Commission proceeding that sets a rate is a "rate case" within the meaning of § 43–612. OPC maintains that the definition of "rate case" adopted by the Commission—i.e., any proceeding that sets a rate and includes a formal hearing—is flawed because one cannot always determine at the outset of a proceeding whether a formal hearing actually will be held. Further, the Commission's definition, OPC argues, creates a category of "rate noncase" not contemplated by the statute. Finally, OPC contends that even if the Commission were correct in ruling that the proceeding was not a "rate case," it had no authority under § 43–612 to order an assessment under OPC's "other investigations" authority

---

1. For more complicated filings, the Commission will docket a matter as a Formal Case. In contrast to the brief notice and comment period for Telephone Tariff proceedings, Formal Case procedures include extensive discovery, presentation of written direct testimony by the parties and the Commission staff, pretrial briefing, hearing sessions before the Commission at which witnesses for the parties and the Commission staff are cross-examined, and post-trial briefing by the parties.

2. OPC had originally submitted a similar notice to the Commission on August 3, 1987. OPC withdrew that notice on August 26, 1987, however, shortly after the Commission had directed OPC and C & P to brief the question of whether the proceeding at issue was a "rate case" for purposes of D.C.Code § 43–612 (1986).

3. On September 21, 1988, OPC filed an "Application for Reconsideration of Order No. 9092." On February 17, 1989, the Commission issued Order No. 9215 denying reconsideration of Order 9092.

without a request for such an assessment from OPC.

## II.

■ Before we address the merits, we must confront the issue of mootness. Intervenor C & P argues that because OPC was granted every dollar it requested, we should dismiss its appeal as moot. Unfortunately, the issue is not quite so simple. D.C.Code § 43–612(a)(3) sets the following limitations on expenditures:

> In any valuation or rate case, neither the Commission nor [OPC] may individually seek special franchise tax deposits of more than one-quarter of 1 percent of the jurisdictional valuation of the company which is the subject of the proceeding. In all other investigations docketed as formal proceedings by the Commission, neither the Commission nor [OPC] shall individually seek special franchise tax deposits in any 1 year of more than one-twentieth of 1 percent of the jurisdictional valuation of each public utility which is the subject of 1 or more investigations during that year.

In actual dollar terms, based on the most recent valuation of C & P, this means that the limitation on OPC's expenditures for *each* "rate case" involving C & P is over $800,000, while the limitation for "all other investigations" involving C & P *combined* during the year is less than $165,000. Thus, every dollar assessed as "other investigations" limits OPC's budget for "other investigations" for the remainder of the year.

In general, then, the question whether the Commission assesses a tax on C & P under OPC's "other investigations" authority or under its "rate case" authority has genuine financial ramifications for OPC. That is not necessarily the case here, however, where the Commission applied the assessment to OPC's 1987 limitation. Because OPC no longer can incur any 1987 expense, and because this assessment did not place OPC above its 1987 "other investigations" ceiling, it is difficult to perceive any actual injury to OPC from this particular ruling. Nonetheless, because this issue

is capable of repetition and yet tends to evade review, we shall address the substance of the Commission's ruling. *See Lynch v. United States*, 557 A.2d 580, 582–83 (D.C.1989) (en banc); *United States v. Edwards*, 430 A.2d 1321, 1324 n. 2 (D.C. 1981) (en banc), *cert. denied*, 455 U.S. 1022, 102 S.Ct. 1721, 72 L.Ed.2d 141 (1982).

## III.

■ In general, we defer to an agency's construction of the statute it is charged with administering, *Chesapeake & Potomac Telephone Co. v. Public Serv. Comm'n*, 378 A.2d 1085, 1089 (D.C.1977), as long as that construction enhances the general purposes and policies underlying the statute. *Washington Gas Light Co. v. Public Serv. Comm'n*, 455 A.2d 384, 386 (D.C.1982). The statute at issue, D.C.Code § 43–612, does not define the term "rate case." In the instant order the Commission ruled that to qualify as a "rate case" a proceeding must both set a rate and include a formal hearing. In arriving at this interpretation, the Commission relied in large part on our decision in *Washington Gas.*

In *Washington Gas*, we reviewed the Commission's ruling that the term "rate case" referred to

> proceedings in which all or some of the rates of a utility are set, proceedings in which a method for determining rates is set, and those cases in which the nexus between that proceeding and ratemaking or ratemaking methodology is so close that, as a matter of regulatory policy, the Commission elects to treat them as a rate case.

455 A.2d at 388. In that case, petitioners C & P and Potomac Electric Power Company argued that the Commission's definition was too broad. *Id.* They offered a much narrower definition, contending the term "rate case" applied only to a general rate case, *i.e.*, a proceeding in which all the rates of a given utility are at issue. *Id.* We rejected petitioners' narrow definition and held that a "rate case" could refer either to a general rate case or to a special rate case, *i.e.*, a proceeding in which only some of the rates of a given utility are set.

*Id.* In taking this position, however, we also rejected the Commission's much broader definition, which included proceedings having only an incidental or indirect effect on rates. *Id.* at 389. We noted, more specifically, that "[t]here is no support in the statute or in common usage that the term 'rate case' is so broad as to encompass adjudicatory or rulemaking proceedings dealing with ratemaking methodology or other proceedings which have [only] some nexus to the setting of utility rates." *Id.*

In arriving at our own definition of the term "rate case" in *Washington Gas,* we examined other sections of the public utilities statute. We noted that D.C.Code § 43–601(c) (1986) provides that utilities must apply to the Commission in order to advance or discontinue current rates and that D.C.Code § 43–608 (1986) authorizes the Commission, on its own initiative or pursuant to a complaint, to investigate rates. *Washington Gas,* 455 A.2d at 388. We then recognized that the Commission has the power to enter an order affecting rates under those statutory sections only after a formal hearing. *Id.* at 389; D.C. Code §§ 43–601(d), –608. Thus, we stated:

> We believe that a logical and sound interpretation of the term "rate case" is clear from a reading of these sections dealing with rates; "rate case" refers to a proceeding, *including a formal hearing,* which results in a Commission order fixing any of the rates of a utility.

*Washington Gas,* 455 A.2d at 389 (emphasis added).

In the present case, OPC characterizes as "strained" the Commission's interpretation of *Washington Gas* as requiring a formal hearing before a rate proceeding

qualifies as a "rate case." It argues that our conclusion in *Washington Gas*—that the term "rate case" cannot encompass proceedings that do not actually set rates, *see id.*—implies that any proceeding in which a rate is actually set must be a "rate case." In effect, OPC argues that the above emphasized language from *Washington Gas* should be read to mean that a "rate case" refers to any proceeding including, *but not limited to,* those involving a formal hearing which results in a Commission order fixing a utility rate. This interpretation ignores our emphasis in *Washington Gas* on the fact that rates can be set pursuant to § 43–601(d) and § 43–608 only after a formal hearing. The Commission's reliance on the definition of a rate case as a proceeding in which rates are set after a formal hearing[4] is in keeping with both the language and the reasoning of *Washington Gas.*

■ While the general purpose of § 43–612 is to require regulated utilities to bear the "reasonable and necessary" costs incurred by the Commission and OPC, *see* D.C.Code § 43–612(a)(2), a more specific purpose of § 43–612(a)(3) is to set limitations on those costs. *See Washington Gas,* 455 A.2d at 390. The statute sets a considerably higher ceiling on OPC's reimbursable expenditures for "rate cases" than for "all other investigations." D.C. Code § 43–612(a)(3). OPC's position that Telephone Tariff proceedings should be included within the definition of a "rate case" makes the statutory limitations on OPC's expenditures meaningless: for the brief notice and comment period involved in every Telephone Tariff proceeding, OPC's expenses would be "limited" to $817,902.50. In light of the relative simplicity of most

---

**4.** The language used by the Commission tracked our language in *Washington Gas* and referred to rate cases as proceedings which "include" a formal hearing. *See Washington Gas,* 455 A.2d at 389. OPC argues, however, that a definition which requires that a hearing actually be held could lead to anomalous results; for example, the hypothetical case of "a rate setting proceeding for which a hearing was [originally] scheduled and which was opposed by the OPC so persuasively that the utility withdrew its case or the Commission dismissed the case without [a]

hearing." If such a situation were to occur, we leave it to the Commission in the first instance to rule on whether a case in which a formal hearing is scheduled but eventually cancelled should be accorded "rate case" treatment. We can imagine a case in which OPC's investment in discovery or in other expenses legitimately incurred in reliance on the Commission's docketing a matter as a "Formal Case" would present novel questions not covered by our ruling in *Washington Gas*—or in this case.

tariff filings, the Commission has concluded that, absent unusual circumstances not present here, there is no need in a routine tariff filing for a formal hearing.[5] It is the presence or absence of a formal hearing, and the discovery and preparation associated with such a hearing, that determines whether OPC's expenses will be relatively large or relatively small. It therefore makes sense that the decision to hold a hearing should determine whether a proceeding setting rates is subject to the higher or the lower statutory limitation on expenses. We therefore conclude that the Commission's decision to classify these Telephone Tariff proceedings as "all other investigations," thereby subjecting them to the lower limitation on expenses, enhances the purposes underlying the statute.[6]

### IV.

 Finally, OPC argues the Commission had no authority to order C & P to deposit a franchise tax of $34,000 for "other investigations" when OPC's request was for $34,000 as a "rate case." OPC cites language in D.C.Code § 43–612(a)(2) which states that "[a]fter completing its review [of an OPC request], the Commission shall either call upon the utilities for the prompt deposit of the special franchise tax ... or inform [OPC] in writing of any specific failures of [OPC] to meet the Commission's enumerated standard of review." OPC maintains this language limits the Commission to accepting or rejecting OPC's request; it does not give the Commission authority to amend the request in any way. OPC adds that such a limitation on the Commission is needed to protect OPC's independence. It contends that allowing the Commission to make assessment orders on a different basis from the one requested would permit the Commission to "chill" OPC's activities.

We do not understand how the Commission's assessment of a tax against C & P in the exact amount requested by OPC, but on a different basis, threatens OPC's independence. Presumably, OPC means that the Commission's actions somehow limit OPC's ability to undertake certain activities. But as discussed earlier, see *supra* Part II, while this particular assessment potentially could have had serious ramifications on OPC's 1987 expenditures, there is no actual "chill" here because the assessment does not put OPC over its 1987 "other investigations" ceiling and OPC can no longer incur any additional 1987 expenses. Nor does this assessment "chill" OPC's future activities, for OPC will now be able to plan its yearly expenses knowing that costs associated with ratesetting proceedings in which a hearing is not to be scheduled will be subject to the annual "other investigations" ceiling.

Without question, the Commission has both the power and the duty to determine whether OPC's request "is consistent with [OPC's] statutory authority" and "whether it is within the limitations enumerated in [§ 43–612(a)(3)]." D.C.Code § 43–612(a)(2). Moreover, we have just upheld the Commission's determination that this proceeding was properly assessed as "all other investigations." We conclude the Commission's actions here were "proper and necessary" to carry out its obligation to determine the appropriate basis for OPC's assessment. *See* D.C.Code § 43–103 (1986) ("The Commission hereby created shall have, in addition to the pow-

---

5. OPC does not argue that the 30–day notice and comment period was inadequate. In fact, we have recently approved an even more streamlined procedure, including only a five-day comment period, for approving C & P's individual case basis (ICB) tariff filings, which are virtually identical to the filing at issue in this case. *See Office of the People's Counsel v. Public Serv. Comm'n,* 571 A.2d 206 (D.C.1990); *cf. Chesapeake & Potomac Telephone Co. v. Public Serv. Comm'n,* 378 A.2d 1085, 1091 (D.C.1977) (approving streamlined procedure for C & P's numerous "new service" filings).

6. OPC's contention that the Commission has effectively created a new category of "rate noncase" is specious. The Commission has merely given meaning to the term "all other investigations." Nor is there any merit to OPC's argument that it will not be able to determine at the outset whether a proceeding will later be deemed a "rate case." The Commission's docketing of a case indicates whether the proceeding will include a formal hearing. See *supra* note 1.

ers ... specified, mentioned, and indicated all additional, implied, and incidental power which may be proper and necessary to effect and carry out, perform, and execute all the said powers herein specified, mentioned, and indicated.").[7]

*Affirmed.*

NEWMAN, Associate Judge, concurring in part and dissenting in part:

Like the majority, I reject C & P's contention that we should decline to reach the merits as to OPC's "rate case" claim on grounds of mootness. *See Lynch v. United States*, 557 A.2d 580, 582–83 (D.C.1989) (en banc). I also join the majority's decision (Part III) on the merits of the "rate case" issue. However, I would decline to consider the issue discussed in Part IV of the majority opinion. PSC awarded the requested $34,000 not under the "rate case" authority but rather under the "other investigations" authority. Payment of that amount was made to OPC. OPC has never sought to return that payment to PSC. Given this posture, I question whether there is a case or controversy requiring judicial resolution.

---

7. OPC also challenges the Commission's determination that the assessment should be applied to OPC's 1987 expenditure totals, arguing it should be applied instead to 1988. This determination was essentially a finding of fact by the Commission, which we will not disturb unless it is "unreasonable, arbitrary, or capricious." D.C. *Code* § 43–906 (1986). In rejecting OPC's argument, the Commission noted that: (1) in its June 27, 1988 notice, OPC did not designate the calendar year to which it sought to have the assessment applied; (2) the proceeding was docketed in calendar year 1987; (3) OPC's initial notice was submitted in 1987; (4) OPC sought recovery for costs incurred in 1987; and (5) the services of OPC's contractors were performed in 1987. We find nothing unreasonable, arbitrary, or capricious about this determination and therefore reject OPC's challenge.